## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION<br><br>_____<br><br><br>IN RE: DIGOXIN CASES<br><br><br>_____<br><br><br>THIS DOCUMENT RELATES TO:<br><br>*ALL INDIRECT RESELLER PLAINTIFF (IRP) ACTIONS* | MDL No. 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE<br><br><br><br><br><br><br>16-DG-27243<br><br>**CLASS ACTION**<br>**JURY TRIAL DEMANDED** |

### INDIRECT RESELLER PLAINTIFFS'

### CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................................ 1

II.    ONGOING INVESTIGATIONS ........................................................................... 3

III.   THE ROLE OF INDEPENDENT PHARMACIES .............................................. 8

IV.    JURISDICTION AND VENUE ........................................................................... 9

V.     PARTIES ............................................................................................................ 10

    A.     Plaintiffs .................................................................................................. 10

    B.     Defendants .............................................................................................. 11

    C.     Co-Conspirators ..................................................................................... 13

VI.    INTERSTATE COMMERCE ............................................................................ 14

VII.   BACKGROUND ON THE GENERIC DRUG INDUSTRY ............................ 14

    A.     Generics drugs are commodity products that compete on price ........................... 14

    B.     Pricing of generic drugs discourages unilateral price increases ......................... 17

VIII.  THE GENERIC DIGOXIN CONSPIRACY ..................................................... 20

    A.     Defendants conspired to increase the price of Digoxin ............................... 20

    B.     As part of the conspiracy, some Defendants increased WACs in lockstep ......... 26

    C.     No shortages or other market changes can justify Defendants' price increases ... 28

    D.     Defendants acknowledge their satisfaction with the lack of competition............. 31

    E.     Defendants had many opportunities to conspire on Digoxin............................... 33

    F.     Defendants' concerted efforts to increase prices for generic Digoxin yielded
          supracompetitive profits.......................................................................... 36

    G.     The Digoxin market is susceptible to collusion ................................................. 37

        1.     Industry concentration ................................................................. 38

        2.     Barriers to entry ........................................................................... 39

        3.     Inelasticity of demand.................................................................. 40

        4.     Lack of substitutes ....................................................................... 41

        5.     Standardized product .................................................................... 42

        6.     Inter-competitor contacts and communications .......................... 43

IX.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .......... 49

    A.     The statutes of limitations did not begin to run because Plaintiffs did not and
          could not discover Defendants' unlawful conspiracy........................................... 49

    B.     Active concealment tolled the statutes of limitations ......................................... 51

        1.     Active concealment of the conspiracy ......................................... 52

        2.     Plaintiffs exercised reasonable diligence ..................................... 53

X.      CONTINUING VIOLATIONS ........................................................................ 54

XI.     DEFENDANTS' ANTITRUST VIOLATIONS.............................................. 54

XII.    CLASS ACTION ALLEGATIONS ............................................................... 57

XIII.   CAUSES OF ACTION .................................................................................. 60

XIV.    PRAYER FOR RELIEF ............................................................................... 102

XV.     JURY DEMAND .......................................................................................... 104

## I.      NATURE OF THE ACTION

1.      This suit brings claims on behalf of indirect purchasers of generic Digoxin ("Indirect Reseller Plaintiffs," "independent pharmacies," or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic Digoxin products, including 125 and 250 microgram tablets.

2.      Digoxin is used to treat mild to moderate heart failure in adults, increase the heart contracting functions for pediatric patients with heart failure, and control the resting heart rate in adult patients with chronic atrial fibrillation. It is derived from the leaves of the digitalis (or foxglove) plant and was first described in medical literature around 1785. It is on the World Health Organization's ("WHO") list of essential medicines.[1] Digoxin must be taken daily and exactly as prescribed to be effective; failure to take Digoxin as prescribed can have catastrophic consequences for heart patients.

3.      For years, competition among sellers of generic Digoxin kept prices stable, at low levels. But starting in the fall of 2013, Defendants, who dominate the market for Digoxin, abruptly and inexplicably raised prices. The average market price for a 250 microgram tablet of generic Digoxin increased by 884% between October of 2013 and April of 2014 and remains at elevated levels today.

4.      The price increases imposed by Defendant manufacturers of generic Digoxin cannot be explained by supply shortages or any other market feature or shock. Nor were they the result of unilateral business decisions. Instead, the significant increases in the prices of Digoxin were the result of an illegal agreement among Defendants to fix prices. Defendants'

---

[1] *See* WHO, http://apps.who.int/medicinedocs/en/d/Js2253e/3.4.html#Js2253e.3.4.

anticompetitive conduct in the Digoxin market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

5.      As alleged below, Defendants arranged their conspiracy partly through in-person meetings at trade association events, which allowed them to actively conceal their agreements from paper or electronic records.

6.      Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Digoxin—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

7.      An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of doxycycline hyclate and glyburide.  But DOJ has made clear that its "investigation is ongoing"[2] and the evidence uncovered during the course of its investigation into those drugs also "implicates…a significant number of the Defendants…[and] a significant number of the drugs at issue" in this Multidistrict Litigation.[3]

8.      The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of the generic drug industry parallel to that of DOJ, confirms that its price-fixing investigation extends "way beyond the two drugs and the six companies. Way beyond… We're learning new things every day."[4] There is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market

---

[2] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products

[3] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

[4] "How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices," Kaiser Health News (Dec. 21, 2016) *available at* http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices

generic drugs in the United States….[and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[5]

9.     Manufacturers of generic Digoxin are implicated in these ongoing investigations; most of the Defendants named here, Lannett Co., Inc. ("Lannett"); Impax Laboratories, Inc. ("Impax"); Par Pharmaceutical, Inc. ("Par"); and Mylan Pharmaceuticals, Inc. ("Mylan"), have received a federal grand jury subpoena and/or an investigative demand from the Connecticut AG as part of the generic drug price-fixing investigations.

10.     Defendants' conspiracy to more than quintuple the price of their products caused Plaintiffs to pay millions more for generic drugs than they paid before the conspiracy.

11.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of all privately held pharmacies in the United States and its territories that indirectly purchased generic Digoxin manufactured by any Defendant, from October 1, 2013 to the present ("Class Period"), and (b) a damages class of all privately-held pharmacies in certain states that indirectly purchased generic Digoxin manufactured by any Defendant, from October 1, 2013 to the present.

## II.    ONGOING INVESTIGATIONS

12.     Now in its third year, the federal criminal investigation into generic drug price-fixing has begun to bear fruit. On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President). The government

---

[5] Connecticut AG, Press Release (Dec. 15, 2016) *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341

alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[6]

13.     On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[7]  Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[8]  As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation.  More criminal charges and guilty pleas are expected to follow.[9]

14.     Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader.  The investigations reportedly cover two dozen drugs and more than a dozen

---

[6] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[7] *See* Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

[8] DOJ Press Release (Dec. 14, 2016) *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer

[9] *See, e.g.,* Eric Kroh, "Generic Drug Price-Fixing Suits Just Tip Of The Iceberg," Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg

manufacturers.[10]  Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[11]

15.    According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever.  *See In re Automotive Parts Antitrust Litig.*, No. 2:12-md-02311 (E.D. Mich.).  As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[12]

16.    DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least sixteen generic drug manufacturers as part of the growing investigation, including: Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax; Lannett; Mayne Pharma, Inc. ("Mayne"); Mylan; Par; Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").

17.    The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant.  DOJ does not empanel grand juries lightly.  The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury

---

[10] David McLaughlin & Caroline Chen, "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," Bloomberg (Nov. 3, 2016) *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end

[11] PaRR Report, "DoJ Believes Collusion over Generic Drug Prices Widespread" (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf

[12] *Id.*

investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[13]

18.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[14]

19.     Another significant indication of criminal price-fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant: "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[15]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also

---

[13] DOJ, Antitrust Division Manual (5th ed. 2015) at Chapter III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf
[14] Mark Rosman & Seth Silber, "DOJ's Investigation Into Generic Pharma Pricing Is Unusual," Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf
[15] Richard Vanderford, "Generic Pharma Investigation Still Broad, Prosecutor Says," mLex (Feb. 21, 2017).

establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[16]

20.     In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs.  Now joined by the Attorneys General of 43 other states and the District of Columbia, the Connecticut AG has filed a civil complaint in the U.S. District Court for the District of Connecticut alleging price-fixing and customer allocation.  Although the States' present complaint focuses on two drugs (doxycycline hyclate delayed release and glyburide), the States make clear that they have "uncovered wide-ranging conduct implicating numerous different drugs and competitors" and suggest that additional drugs and manufacturers will be added "at the appropriate time."[17]

21.     The publicly available version of the State AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications, which the Connecticut AG has described as "mind-boggling."[18]  The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications. "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."  This affords them opportunities to "exploit their interactions

---

[16] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available at* https://www.justice.gov/atr/page/file/926521/download

[17] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (Doc. 168 at ¶ 9) (State AG Amended Complaint).

[18] Mark Pazniokus, "How a small-state AG's office plays in the big leagues," CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/

at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[19]

22.     The indictments and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg. The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[20] Plaintiffs do not yet have access to all of the information available to the government enforcement agencies.  What is known is that on the heels of meetings at industry events, Defendants raised Digoxin prices to previously unheard-of levels.   It is clear that the large and unprecedented price increases for generic Digoxin cannot be explained by normal, competitive market forces.  The explanation is collusion.

### III.     THE ROLE OF INDEPENDENT PHARMACIES

23.     There are approximately 22,000 privately-owned independent pharmacies in the United States, as contrasted with chain drug stores such as CVS, Walgreens, and Rite Aid, and mass merchandiser or supermarket drug stores such as Wal-Mart, Target and Kroger. Over a billion prescriptions for U.S. patients are dispensed through independent pharmacies each year.

24.     The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to independent pharmacies. Independent pharmacies rarely purchase generic drugs directly from the manufacturer, and instead acquire drugs almost exclusively from drug wholesalers such as McKesson Corp., Cardinal Health Inc., or Amerisource Bergen Corp. As one would expect, the wholesaler's price includes a percentage markup over the

---

[19] State AG Amended Complaint ¶ 7.
[20] State AG Amended Complaint ¶ 1.

manufacturer's price. Independent pharmacies, lacking the sales volume heft and wholesaler relationships enjoyed by their much larger competitors, have no meaningful ability to negotiate these acquisition costs. They must pay the price the wholesaler charges. As a result, when drug manufacturers collude to allocate customers or raise the prices of generic drugs, independent pharmacies end up paying illegally inflated prices for those drugs

## IV.    JURISDICTION AND VENUE

25.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

26.     This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

27.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

28.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the

offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[21]

29.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Digoxin throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## V.     **PARTIES**

### A.     **Plaintiffs**

30.     Plaintiff West Val Pharmacy ("West Val") is a privately held independent pharmacy that has been in business since 1959 and is currently located at 5353 Balboa Boulevard in Encino, California. West Val Pharmacy indirectly purchased and continues to purchase Defendants' generic Digoxin products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

31.     Plaintiff Halliday's & Koivisto's Pharmacy ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. Halliday's indirectly purchased and continues to

---

[21] DOJ, Antitrust Division Manual at III-83.

purchase Defendants' generic Digoxin products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

32.     Plaintiff Russell's Mr. Discount Drugs, Inc. ("Russell's") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. Russell's indirectly purchased Defendants' generic Digoxin products at supracompetitive prices during the class period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

33.     Plaintiff Falconer Pharmacy, Inc. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. Falconer Pharmacy indirectly purchased and continues to purchase Defendants' generic Digoxin products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

34.     Plaintiff Deal Drug Pharmacy ("Deal Drug") is a privately held independent pharmacy in Nashville, Tennessee. Deal Drug indirectly purchased and continues to purchase Defendants' generic Digoxin products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

35.     Plaintiff Chet Johnson Drug, Inc. ("Chet Johnson") is a privately held independent pharmacy in Avery, Wisconsin. Chet Johnson indirectly purchased and continues to purchase Defendants' generic Digoxin products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

**B.     Defendants**

36.     Defendant Impax Laboratories, Inc., is a Delaware corporation that has its principal place of business in Hayward, California. As noted above, Impax's generics division is called Global Pharmaceuticals ("Global") and is a manufacturer and distributor of generic Digoxin.

During the Class Period, Global sold generic Digoxin to customers in this District and other locations in the United States.

37.     Defendant Lannett Company, Inc. is a Delaware corporation that has its principal place of business in Philadelphia, Pennsylvania. Lannett is the exclusive distributor of generic Digoxin manufactured by Jerome Stevens Pharmaceuticals, Inc. ("JSP"), a New York corporation with its principal place of business in Bohemia, New York. During the Class Period, Lannett sold generic Digoxin to customers in this District and other locations in the United States.

38.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.

39.     Defendant Mylan Inc., is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania. Mylan Inc. and Mylan Pharmaceuticals Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.   In this complaint, Defendants Mylan Inc. and Mylan Pharmaceuticals Inc. are together referred to as "Mylan." During the Class Periods, Mylan sold Digoxin to purchasers in this District and throughout the United States.

40.     Defendant Par Pharmaceutical, Inc., is a New York corporation with its principal place of business in Chestnut Ridge, New York. In January 2014, Par announced that it had entered into an exclusive United States supply and distribution agreement with Covis Pharma S.à.r.l. ("Covis") to distribute the authorized generic version of Covis's Lanoxin® (Digoxin) tablets. At that time, Par began selling and shipping Digoxin in this country. Par sold generic Digoxin to customers in this District and other locations in the United States. Par is a subsidiary of Endo International plc ("Endo"), an Irish pharmaceutical company.  In September 2015, Endo completed an acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including Par, from a

private investment firm for about $8 billion in cash and stock.  At that time Endo created a combined U.S. Generics segment that included Par, and Endo's subsidiary Qualitest, naming the segment Par Pharmaceutical, Inc

41.     Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. West-Ward is the United States agent and subsidiary of Hikma Pharmaceuticals PLC ("Hikma"), a London-based global pharmaceutical company and is a manufacturer and distributor of generic Digoxin. During the Class Period, West-Ward sold generic Digoxin to customers in this District and other locations in the United States.

42.     Whenever reference is made in this Complaint to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs

### C.     Co-Conspirators

43.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein, although their identities are not yet known to Plaintiffs. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VI.     INTERSTATE COMMERCE

44.     During the Class Period, Defendants sold and distributed generic Digoxin in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

45.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Digoxin, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

46.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive generic Digoxin to Plaintiffs inside each respective state and territory. The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## VII.     BACKGROUND ON THE GENERIC DRUG INDUSTRY

### A.     Generics drugs are commodity products that compete on price

47.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[22] In 2015, generic drug sales in the United States were estimated at $74.5 billion.[23]

48.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and

---

[22] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf
[23] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341

intended use."[24] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[25]

49.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[26]  And that may be conservative.  According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[27] Mature generic markets—like that of Digoxin—typically have several manufacturers that compete for sales, hence keeping prices in check.

50.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs.  Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[28]

51.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585). The Act streamlines the regulatory

---

[24] FDA Website, *available at*
http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G
[25] *Id.*
[26] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800
[27] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf
[28] GPhA Report at 1.

hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

52.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

53.     Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature. As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[29]   In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

54.     It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales.  When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the cheaper alternatives.  Over time, the price of a generic drug approaches the manufacturers' marginal costs.  As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

---

[29] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf



Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

55.     When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share.  A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[30]

56.     When there are multiple generic manufacturers in an established generic market—as with generic Digoxin—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

**B.     Pricing of generic drugs discourages unilateral price increases**

57.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies

---

[30] GAO Report at 23.

dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (e.g., a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

58.     Because the prices paid by purchasers of generic drugs differ at each level of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Marketwide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").  NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[31]  "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies," in effect "a single national average."[32]  Thus, NADAC is one way to track general price trends in the marketplace.

59.     While NADAC provides the average price level across all manufacturers of a given drug, other price measures are manufacturer-specific.  Drug manufacturers typically report benchmarks—like Wholesale Acquisition Cost ("WAC")—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry.  The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price, which is sometimes subject to discounts.  In order track manufacturer-specific pricing, this complaint uses

---

[31] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.
[32] *Id.*

QuintilesIMS's National Sales Perspectives ("NSP") data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets.[33]

60.    When third-party payers (e.g., health plans) pay pharmacies to dispense drugs to their covered patients, the amount is typically determined with reference to a benchmark or list price like a WAC.  Some third-party payers and PBMs have implemented their own individual caps—Maximum Allowable Cost ("MAC")—that set the maximum amounts they will pay pharmacies for some generic drugs, regardless of the pharmacies' acquisition costs. A pharmacy must often dispense the drug at a loss if it cannot find a wholesaler offering the drug at a price or below the MAC cap.

61.    Although MAC caps do not apply directly to manufacturers, these caps impose a restraint on manufacturers' prices. The MAC cap essentially limits the pharmacies' discretion to adjust retail prices upwards, so pharmacies are incentivized to buy from the cheapest wholesaler and wholesalers to buy from the cheapest manufacturer. This additional pressure on prices means a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price.  Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.  In a market with MAC caps, it is unlikely that a generic drug manufacturer would risk raising its price unless it has been agreed with competitors that they will raise their prices, too.

---

[33]  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

## VIII.   THE GENERIC DIGOXIN CONSPIRACY

**A.     Defendants conspired to increase the price of Digoxin**

62.     Digoxin is sold throughout the United States and its territories. At all relevant times, Defendants had substantial market power with respect to generic Digoxin.  Defendants exercised this power to maintain supracompetitive prices for Digoxin without losing so many sales as to make the elevated price unprofitable. Defendants sold generic Digoxin at prices in excess of marginal costs, in excess of a competitive price, and enjoyed high profit margins.

63.     During the Class Period, Defendants dominated the Digoxin market.  Defendants controlled approximately 97% of the generic Digoxin market by 2014, implying a substantial amount of market power. [redacted]

64.     There are no legitimate reasons or explanations for the Defendants' unprecedented and steep price increases for Digoxin.

65.     Until the last few years, generic Digoxin pricing was remarkably stable. These price increases were caused by sudden and abrupt pricing changes made by Lannett, West-Ward, and Impax that were not meaningfully challenged by Par and Mylan when they entered the market in 2014 and 2015, respectively. Pricing for .125 mg and .250 mg tablets of Digoxin increased by roughly tenfold, from [redacted].

66.     The National Average Drug Acquisition Cost ("NADAC") data on generic Digoxin show average price increases that led to substantially higher prices for generic Digoxin products for the .125 mg tablet dosage of generic Digoxin (sold by Lannett, Impax, Par, West-Ward, and Mylan) during the period from October 2012 to April 2015.



67.    The following chart, based on NADAC data, shows the pricing of the .250 mg tablet dosage of generic Digoxin (made by Lannett, West-Ward, Impax, and Mylan) during the period from October 2012 to mid-March 2015:



68.    By way of further example, the striking jump in prices for Impax's and Lannett's Digoxin tablets can be seen in the following tables:

| WAC for Impax's Digoxin (.125 mg tablets, 1 bottle, 100 pills)[34] | |
|---|---|
| **Price** | **Effective** |
| $14.21 | 05/26/2010 |
| $118.50 | 10/22/2013 |

| WAC for Lannett's Digoxin (.125 mg tablets, 1 bottle, 100 pills)[35] | |
|---|---|
| **Price** | **Effective** |
| $14.21 | 08/19/2002 |
| $17.45 | 04/01/2009 |
| $118.50 | 10/16/2013 |

69.     As these tables show, the wholesale acquisition cost, or WAC, for Lannett's .125

mg Digoxin tablets increased only 22% over a period of nearly seven years from 2002 to 2009. By

contrast, in a little over four years, Lannett increased its prices by 579%.  Impax's Digoxin tablets

experienced a similarly large price increase, with prices going from $14.21 per bottle in May 2010

to $118.50 per bottle in October 2013—an increase of around 734% in a little over three years.

70.     Defendants' price hikes are further illustrated in the following IMS data charts

showing the monthly price per unit for .125mg and .250mg generic Digoxin tablets manufactured

and/or distributed by Defendants Impax (Global Pharm), Lannett, Par, Westward, and Mylan:

---

[34] Oppenheimer Equity Research, Lannett Company, Inc., at 2 (Feb. 7, 2014).

[35] *Id.*

[chart redacted]

[chart redacted]

71.     **Impax**: For over three years before the Class Period began, the average effective price per unit of its products was [redacted].

72.     In September 2013, its effective prices remained the same.  But in October 2013, it began a drastic increase of its effective prices:[36]

| Digoxin Product | Price Sept. 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| TAB 0.125 mg | [redacted] | [redacted] | [redacted] | [redacted] |
| TAB 0.25 mg | [redacted] | [redacted] | [redacted] | [redacted] |

73.     Impax's effective prices would continue to climb, peaking several months later, increasing as much as [redacted] above its pre-conspiracy price levels:

| Digoxin Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB 0.125 mg | [redacted] | [redacted] | [redacted] |
| TAB 0.25 mg | [redacted] | [redacted] | [redacted] |

74.     Even today, Impax's effective prices remain unexpectedly high and would not have remained so high but for the price fixing conspiracy.  For example, in April 2016, its prices were as much as [redacted] higher than in September 2013:

| Digoxin Product | Price Sept. 2013 | Price Apr. 2016 | Percentage Increase |
|---|---|---|---|
| TAB 0.125 mg | [redacted] | [redacted] | [redacted] |
| TAB 0.25 mg | [redacted] | [redacted] | [redacted] |

---

[36] Effective prices are calculated to 12 decimals; for ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precise calculated price (*i.e.*, the number defined by as many as 12 decimals).

75.     **Lannett**: For over two years before the Class Period began, the average effective price per unit of its products was [redacted].

76.     In September 2013, its effective prices remained the same.  But in October 2013, it began a drastic increase of its effective prices:[37]

| Digoxin Product | Price Sept. 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| TAB 0.125 MG | [redacted] | [redacted] | [redacted] | [redacted] |
| TAB 0.25 MG | [redacted] | [redacted] | [redacted] | [redacted] |

77.     Lannett's effective prices would continue to climb, peaking several months later, increasing as much as [redacted] above its pre-conspiracy price levels:

| Digoxin Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB 0.125 MG | [redacted] | [redacted] | [redacted] |
| TAB 0.25 MG | [redacted] | [redacted] | [redacted] |

78.     Even today, Lannett's effective prices remain unexpectedly high and would not have remained so high but for the price fixing conspiracy.  For example, in April 2016, its prices were as much as [redacted] higher than in September 2013:

| Digoxin Product | Price Sept. 2013 | Price Apr. 2016 | Percentage Increase |
|---|---|---|---|
| TAB 0.125 MG | [redacted] | [redacted] | [redacted] |
| TAB 0.25 MG | [redacted] | [redacted] | [redacted] |

---

[37] Effective prices are calculated to 12 decimals; for ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precise calculated price (*i.e.*, the number defined by as many as 12 decimals).

79.     **Par**: Instead of lowering its prices in order to undercut the competition and gain market share, Par entered the market in early 2014 at the agreed-upon artificially inflated prices [redacted].  Par's initial prices were comparable to Defendants' peak prices and remain much higher today as a result of the conspiracy, *e.g.* recent effective prices of [redacted] for its 0.125 mg and 0.25 mg tablets respectively in April 2016.  These prices could not have been sustained but for Defendants' price fixing conspiracy.

80.     **West Ward**: From May 2010 through the end of 2012, before West-Ward temporarily exited the market, the average effective price per unit of its products was [redacted]. When West-Ward returned to the market in April 2014, instead of offering a lower price to gain back market share, it sold its 0.25 mg tablet at about [redacted], an extraordinary increase over its pre-conspiracy prices.  Its initial prices for both products were comparable to Defendants' peak prices and remain much higher today as a result of the conspiracy, *e.g.* recent effective prices of [redacted] and [redacted] for its 0.125 mg and 0.25 mg tablets respectively in April 2016.  These prices could not have been sustained but for Defendants' price fixing conspiracy.

   **B.     As part of the conspiracy, some Defendants increased their WAC benchmarks in lockstep**

81.     An individual manufacturer's WAC increase influences the actual prices paid by direct purchasers.  This is the case here, where Defendants dominate the Digoxin market.  In October 2013, Lannett and Impax reported identical WACs—even though that meant a several fold increase from their previous benchmarks.  Instead of competing on price, Par, West-Ward, and Mylan, reported the same WAC benchmarks as Lannett and Impax, as they entered the market:[38]

---

[38] For ease of reference, WAC prices are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.

| Digoxin Product | Defendant | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|
| 0.125mg, 100 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.125mg, 100 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.125mg, 100 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.125mg, 100 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.125mg, 100 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| Digoxin Product | Defendant | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|
| 0.125mg, 1,000 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.125mg, 1,000 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.125mg, 1,000 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.125mg, 1,000 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.125mg, 1,000 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| Digoxin Product | Defendant | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|
| 0.25mg, 100 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.25mg, 100 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

27

| Digoxin Product | Defendant | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|
| 0.25mg, 100 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.25mg, 100 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.25mg, 100 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| Digoxin Product | Defendant | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|
| 0.25mg, 1,000 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.25mg, 1,000 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.25mg, 1,000 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.25mg, 1,000 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 0.25mg, 1,000 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

82.     Defendants' price increases for Digoxin resulted in corresponding increases to the prices paid by Plaintiffs and members of the proposed Classes.  Corresponding increases in Digoxin's transactional prices demonstrate that increased WAC prices translate to increases in the prices actually paid by Plaintiff pharmacies when they purchased Digoxin from wholesalers.

**C.     No shortages or other market changes can justify Defendants' price increases**

83.     There were no reasonable competitive justifications for these abrupt shifts in pricing conduct. To the contrary, anticompetitive activity explains these skyrocketing prices. Richard Evans at Sector & Sovereign Research recently wrote: "[a] plausible explanation [for price

increases of generic drugs, including generic Digoxin] is that generic manufacturers, having fallen to near historic low levels of financial performance, are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."[39]

84.     These price increases were not due to supply disruptions. As stated at the website of the Generics and Biosimilars Initiative on August 29, 2014, "[a]t the time of the [Digoxin] price increases, the U.S. Food and Drug Administration had reported no drug shortages, there was no new patent or new formulation and Digoxin is not difficult to make. The companies have not yet provided an explanation for the price rise."[40] With regard to drug shortages, federal law requires drug manufacturers to report potential shortages to the FDA, the reasons therefor, and the expected duration of the shortage,[41] but no supply disruption was reported by the relevant Defendants with respect to Digoxin in the fall of 2013.

85.     The presence or absence of competitors in the marketplace also does not explain the substantial price increases of generic Digoxin. From October 2012 to around November 21, 2013, the NADAC average price of generic Digoxin was consistently around $0.11 for the .125 mg tablets and between $0.11 and $0.12 for the .250 mg tablets, despite the fact that for a portion of the period after West-Ward suspended production, Lannett and Impax were the only significant players in the market. West-Ward's return to the market in July 2013 also did not affect pricing. Indeed, throughout 2012 and through September 2013, as Dr. Schondelmeyer's chart shows, the

---

[39] See Ed Silverman, "Generic Drug Prices Keep Rising, but is a Slowdown Coming?" Wall St. J. (April 22, 2015), *available at* http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming.

[40] "Lawyers look at new price hike for old drug," (Aug. 28, 2014), *available at* http://www.gabionline.net/Generics/General/Lawyers-look-at-new-price-hike-for-old-drug.

[41] *See* FDA, "Frequently Asked questions about Drug Shortages", *available at* http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm#q.

price of generic Digoxin remained steady. Following the astronomical price increases in the fall of 2013, Par entered the market in early 2015 and Mylan entered the market in 2015, but prices did not fall even with the addition of new competitors. Pricing remains inflated to this day.

86.     The steep Digoxin price hikes have had a catastrophic effect on consumers. According to a December 2013 report:

> Bill Drilling, an owner of a pharmacy in Sioux City, Iowa, apologizes as he rings up a customer's three-month supply of the heart medicine Digoxin. The total is $113.12—almost 10 times the cost for the same prescription in August. Digoxin isn't a new miracle drug. . . . "I've been doing this since 1985, and the only direction that generics-drug prices have gone is down," Drilling says….

> *            *            *

> "This is starting to create hardship," he says. Many of his customers fall into what is known as the Medicare "doughnut hole," a coverage gap in which patients pay 47.5 percent of branded-drug costs and 79 percent of a generic's price. Russ Clifford, a retired music teacher, learned Digoxin's cost had jumped more than fourfold when he picked up his 30-day supply in mid-November. Clifford and his wife have had to dip into savings to pay their rising pharmaceutical bills.[42]

87.     These massive price increases adversely affected patients' ability to purchase their Digoxin medications. An independent pharmacist described the hardship caused by the Digoxin price increases with this anecdote offered at the Senate Hearing:

> A recent example from my own experience is the price of Digoxin—a drug used to treat heart failure. The price of this medication jumped from about $15 for 90 days' supply, to about $120 for 90 days' supply. That's an increase of 800%. One of my patients had to pay for this drug when he was in the Medicare Part D coverage gap in 2014. Last year, when in the coverage gap he paid the old price. This year he paid the new price. Needless to say, the patient was astounded, and thought I was overcharging

---

[42] Bloomberg, "Surprise Generic Drug Prices Spike", *available through subscription at* http://www.bloomberg.com/bw/articles/2013-12-12/generic-drug-prices-spike-in-pharmaceutical-market-surprise.

him. The patient called all around to try to get the medicine at the old, lower price, but to no avail.[43]

88.     Independent pharmacists may dispense at a loss when they know certain uninsured patients will have trouble affording necessary drugs, but when the price increases are severe, the pharmacy's charity can only reach so far. The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to independent pharmacies.  A manufacturer first sells the drug to direct purchaser wholesalers based on the listed WAC, minus applicable discounts. Wholesalers then sell the drug to pharmacies. Independent pharmacies in particular cannot meaningfully negotiate their acquisition costs or their retail prices for insured patients (because these are subject to network agreements).

### D.     Defendants acknowledge their satisfaction with the lack of competition

89.     The collusion relating to generic Digoxin was implemented and reinforced by Lannett's, Impax's, and Hikma's own statements—in documents and in oral remarks at earnings calls.

90.     In a fourth quarter 2013 earnings call that occurred on September 10, 2013, Bedrosian announced Lannett's intention to increase prices and his expectations that his competitors would follow suit.  Discussing the role of Lannett's Vice-President of Sales, Kevin Smith (one of the persons apparently subpoenaed by DOJ), Bedrosian said:

> We're not a price follower. We tend to be a price leader on price increasing and the credit goes to my sales vice president. He [Smith] takes an aggressive stance towards raising prices. He understands one of his goals, his objectives as a sales vice president is to increase profit margins for the company. And he's the first step in that process.…**I am finding a climate out there has been changed dramatically and I see more price increases coming from our competing—competitors than I've seen in the past. And we're going to continue to lead. We have more price increases**

---

[43] Frankil Testimony, *available at* http://www.help.senate.gov/imo/media/doc/Frankil.pdf.

**planned for this year within our budget. And hopefully, our competitors follow suit.** (Emphasis added.)

91.    In a subsequent earnings call, Bedrosian reported that Lannett's chief competitor had indeed heeded his call for price increases. In an earnings call on November 7, 2013—after the initial generic Digoxin price increases—Bedrosian noted, referring to Impax, that **"[w]e've had a recent price increase on the [generic Digoxin] product as well because we are now only 1 of 2 people in the market.** And as a result, I expect that product to do very well." (Emphasis added.)

92.    The very next quarter, Bedrosian expressed complacency about Par entering as a new competitor: "And we see Par as one of our rational competitors in the marketplace." As he went on to note, "we're not troubled by their pricing in the marketplace. Not at all."

93.    In a quarterly earnings call held on November 3, 2014, Bedrosian again expressed confidence that Lannett would not have to engage in price competition generally in the generic drug market. He said Lannett and its competitors were "less concerned about grabbing market share. We're all interested in making a profit, not how many units we sell." Bedrosian went on to discuss, *inter alia*, Par and Impax, saying:

> "**[T]he companies we're looking at here are not irrational players. I don't see them just going out and trying to grab market share.**" (Emphasis added.) He also noted that Mylan was expected to enter the market, "but **Mylan is one of those rational competitors, so we're not really expecting anything crazy from them**." (Emphasis added.) He predicted that price increases would continue. But there is nothing "rational" in expecting new market entrants to eschew price competition and disavow market share.

94.    On February 4, 2015, in another quarterly earnings call, Bedrosian confirmed there would be a moratorium on price competition. He stated: "I think you're going to find more capital pricing [in the generic marketplace], more—I'll say less competition, in a sense. You won't have price wars." In his view, "I just don't see the prices eroding like they did in the past."

95.     In competitive markets the entry of new competitors tends to lead to increased competition and lower prices. This is the "rational" or expected result and is well documented in the generic drug industry. Lannett's expectation that Impax, Par and Mylan, among others, would behave in exactly the opposite way suggests an agreement among them not to compete on price. Their subsequent conduct – raising prices, electing not to increase market share – further suggests the existence of such an agreement. The announcement themselves reinforced the agreement.

96.     Bedrosian has also been quoted as saying that "[s]o whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful. Because Lannett tends to be active in raising prices."[44] He referred to sending a "thank you note" to one of his "rational" competitors.[45]

97.     Frederick Wilkinson, the CEO of Impax, also spoke to this topic in a third quarter 2014 earnings call: "[W]e've done what most of the other generic competitors have done, we look at opportunities, we look at how competition shifts, we look at where there may be some market movement that will allow us to take advantages on price increases and we've implemented those…." Likewise, during a November 4, 2013 earnings call, former Impax President Carole Ben-Maimon, when asked about her company's "huge price increase on Digoxin following Lannett's pricing action," responded that "[t]he price increase for dig[oxin] speaks for itself…." In a February 20, 2014 earnings call, she stated that "the market has been pretty stable enough . . . . **We're pretty comfortable that what we've done is rational and will result in ongoing profitability for that product.**" (Emphasis added.)

### E.     Defendants had many opportunities to conspire on Digoxin

---

[44] " 'Lannett (LCI) Lawsuits Will Wipe Out The Equity' Citron Research" (Jan. 17, 2017), available at http://www.valuewalk.com/2017/01/lannett-lci-citron-research/.
[45] *Id.*

98.     To be successful, collusive agreements require a level of trust among the conspirators. While this can be accomplished by one-on-one communications, collaboration is also fostered through industry associations, which facilitate relationships between individuals who should otherwise be predisposed to compete vigorously with each other.

99.     As alleged by the state AGs, "the defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences and other events . . . ."[46]

100.    For instance, Defendants met at conferences held by their customers, such as wholesalers or distributors (McKesson, AmeriSource Bergen Corporation, Cardinal Health, Inc., H.D. Smith, LLC, and Morris & Dickson, LLC), GPOs (Econdisc, Vizient, Premier, Inc., Intalere, and Minnesota Multistate Contracting Alliance for Pharmacy), and retailers (such as Rite Aid Corporation, the Walgreen Company, Wal-Mart Stores, Inc., Target Corporation, and Publix Super Markets, Inc.).

101.    Defendants also met through trade associations, including the GPhA, which describes itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."[47] Current "Regular Members" of the GPhA include Defendants Impax, Mylan, Par, and West-Ward. Regular Members "are corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[48] Several of Defendants' high-

---

[46] Connecticut AG, http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[47] GPhA, http://www.gphaonline.org/about/the-gpha-association.

[48] GPhA, http://www.gphaonline.org/about/membership.

ranking officers serve on GPhA's Board of Directors, including Mylan's Heather Bresch, Impax's Marcy MacDonald, and Par's Tony Pera.  Ms. Bresch serves as the GPhA's current Chairperson.

102.    Representatives from Defendants attended periodic meetings held by GPhA.[49] The following table lists some of the GPhA meetings attended by Defendants' employees, which provided ample opportunities for private discussions in furtherance of their conspiracy:

| Meeting | Meeting Date & Location | Attendees |
| --- | --- | --- |
| 2012 GPhA Annual Meeting Business Exposition | February 22-24, 2012 Orlando, Florida | Mylan, Par |
| 2012 GPhA Fall Technical Conference | October 1-3, 2012 Bethesda, Maryland | Impax, Lannett, Mylan, Par |
| 2013 GPhA Annual Meeting | February 20-22, 2013 Orlando, Florida | Impax, Mylan, Par |
| 2013 GPhA Fall Technical Conference | October 28-30, 2013 Bethesda, Maryland | Impax, Lannett, Mylan, Par |
| 2014 GPhA Annual Meeting | February 19-21, 2014 Orlando, Florida | Actavis, Impax, Mylan, Par |
| 2014 GPhA Fall Technical Conference | October 27-29, 2014 Bethesda, Maryland | Impax, Lannett, Mylan, Par, West-Ward |
| 2015 GPhA CMC Workshop | June 9-10, 2015 Bethesda, Maryland | Impax, Lannett, Mylan, Par, West-Ward |

---

[49] *See* GPhA, http://www.gphaonline.org/index.php/events/2013-annual-meeting-past-attendees; http://www.gphaonline.org/index.php/events/2014-annual-meeting-past-meeting-attendees; http://www.gphaonline.org/events/past-events/2012-gpha-fda-fall-technical-conference; http://www.gphaonline.org/events/past-events/gpha-2013-fall-technical-conference.

103.    They also met at industry trade shows such as those hosted by the GPhA, the NACDS, The Healthcare Distribution Alliance, ████████, and the American Society of Health-System Pharmacists.

104.    In addition, there were numerous private industry dinners of high-level executives of generic pharmaceutical manufacturers. For instance, there was a January 2014 dinner attended by 13 high-ranking executives from a number of manufacturers, including Defendants.  And there were regular meetings and dinners attended by female generic pharmaceutical sales representatives that were known as "Girls Night Out" ("GNOs") or "Women In Industry" events. They were often held in connection with industry conferences. As described in paragraph 57 of the AG Complaint, Defendants' representatives used these meetings to "meet with their competitors and discuss competitively sensitive information." In addition, there were events in connection with an ████████ ████████████████████████ a meeting in Baltimore in May 2015, and the NACDS conference held in August 2015.

105.    Thus, Defendants' representatives had numerous opportunities to meet and conspire at trade association meetings, as well as at industry healthcare meetings.

## F.    Defendants' concerted efforts to increase prices for generic Digoxin yielded supracompetitive profits

106.    This meeting of the minds among the competing sellers of generic Digoxin assured them handsome profits. Bedrosian noted in the February 4, 2015 earnings call that Lannett "recorded the highest net sales and net income in our company's history." Gross profits in the first six months of the 2015 fiscal year were $158.8 million or 76% of net sales, compared with $42.3 million or 37% of net sales during the previous fiscal year. Generic Digoxin accounted for 23% of the company's revenues, and Lannett has acknowledged that it is highly dependent on price increases for revenue growth.

107.    Similarly, according to its 2015 SEC Form 10-K filed on February 26, 2015, Impax's 2014 revenues were $596 million, compared to $511 million in 2013—a 17% increase. One of the primary factors in this growth was "higher sales of our Digoxin."[50]

108.    Defendants' agreement to inflate the prices of generic drugs led to increased revenue and higher profits – which was a motive for the conspiracy.  In addition, the burgeoning profits of the illegal scheme drove company share prices higher, which provided further motive to conspire.  For example, Lannett's stock price in October 2012 was under $5.  But by April 2015, Lannett's share price had skyrocketed to more than $70, fueled by the inflated profits from generic drugs.  Bedrosian, the Lannett CEO, owned more than 600,000 shares of stock during this time frame, the value of which increased by tens of millions of dollars. Other Defendants' stock prices also exploded with the profits of their price-fixing scheme.  For example, the share prices of Mylan and Hikma approximately tripled between October 2012 and mid-2015.

### G.    The Digoxin market is susceptible to collusion

109.    Publicly available data on the generic Digoxin market in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

---

[50] Impax Form 10-K (Feb. 26, 2025), available at http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/c545ab21-aa3d-4426-a0b9-ba4373b6c213.pdf?noexit=true.

### 1. Industry concentration

110.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.  Here, Defendants control over 90% of the generic Digoxin market.

111.    As described above, in the United States generic Digoxin markets, the number of meaningful competitors has dwindled, creating conditions favorable to an effective cartel. The firms that currently control most of the market are Defendants. A graphic available at the website of one pharmacy benefits manager ("PBM")[51] reflects this development with respect to the market for generic Digoxin:



112.    By the third quarter of 2013, the Digoxin market was an effective duopoly and new entrants in 2014 were perceived as "rational" competitors who would not disrupt the existing price structure.

113.    In fact, the combined market share of Defendants' generic Digoxin was nearly 80% in 2012, 91% in 2013 and 97% in 2014.

---

[51] Optum, "Rising Generic Prices: What can be done?" (March 2, 2015), *available at* http://www. optum.com/resources/library /whatcanbedone.html.

114.    While the market for Digoxin is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition. Absent collusion, prices would have remained at competitive levels.

115.    The magnitude of Defendants' price increases for Digoxin distinguishes them from non-collusive oligopolistic pricing.  Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price increase.  Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

## 2.  Barriers to entry

116.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

117.    There are significant capital, regulatory, and intellectual property barriers to entry in the generic Digoxin markets that make such entry time-consuming and expensive.

118.    Par's own 2015 Form 10-K (cited above) states that its business is to develop and commercialize "generic drugs with limited competition, high barriers to entry and longer life cycles."

119.    Costs of manufacture, coupled with regulatory oversight, represent a substantial barrier to entry in the generic Digoxin market. This is reflected in West-Ward's having to shut down temporarily its New Jersey production facility for Digoxin and spend $39 million on remediation. Likewise, Impax's 2015 Form 10-K (cited above) referenced FDA warning letters it received with respect to its manufacturing facilities in Hayward, California and Taiwan.

120.     Intellectual property costs can also be substantial, as reflected in Par's Digoxin licensing deal with Covis and Lannett's licensing arrangement with JSP.

121.     In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time. As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[52] This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 3.  Inelasticity of demand

122.     A product exhibits completely inelastic demand if buyers will continue to buy it regardless of the price. No product is completely inelastic, but prescription medicines come close.

123.     Demand for Defendants' Digoxin products is inelastic largely because, while they are somewhat interchangeable with one another, they cannot be substituted for other products given their pharmacological characteristics.  Additionally, the incentives of actors in the Digoxin market are not sensitive to price, as they are in most other markets.  Doctors who prescribe Digoxin have the best therapy and not the cheapest cost in mind; patients cannot write themselves a prescription for a cheaper substitute or comfortably forgo treatment; and pharmacies have no choice but to fill the prescription as written.  When Defendants increased their Digoxin prices, independent pharmacies could not simply purchase and dispense less-expensive alternative products.

---

[52] Senator Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf

124.     In order for a cartel to profit from raising prices above competitive levels, demand must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining sales, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

125.     Thus, generic Digoxin is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

### 4.  Lack of substitutes

126.     In the case of Digoxin, while other medications exist for the treatment of atrial fibrillation, many doctors, particularly geriatricians and general practitioners, see Digoxin as the primary medication for the treatment of this condition.

127.     Furthermore, other atrial fibrillation drugs have different mechanisms for treating atrial fibrillation that can be used as complements to, rather than substitutes for, Digoxin. For example, sodium and potassium channel blockers like flecainide, propafenone, or sotalol, are used for controlling heart *rhythm* in patients with atrial fibrillation, while Digoxin is used to control heart *rates* in patients with atrial fibrillation.

128.     Even other heart rate controlling medications, such as beta blockers, are not ready substitutes for Digoxin tablets because they have different chemical and pharmacokinetic properties that may not make them suitable treatment options under many circumstances. One study published in the *Journal of the American College of Cardiology* found "that Digoxin is still

41

a first-line alternative to control ventricular rate in patients with atrial fibrillation, particularly in cases with congestive heart failure and left ventricular systolic dysfunction."[53]

129.    In addition, branded versions of Digoxin tablets do not serve as economic substitutes for generic versions of these compounds because branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar.  For example, WAC pricing for Lanoxin (the branded version of Digoxin tablets) was $240.00 per 100 tablet bottle in August 2013, which was more than double both Impax's and Lannett's WAC prices for Digoxin tablets around that time, which was $118.50 per 100 tablet bottle.[54]

130.    Thus, purchasers of Digoxin tablets are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

131.    Thus, purchasers of generic Digoxin are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 5.  Standardized product

132.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

133.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving

---

[53] Henrique H. Veloso & Angelo A.V. de Paola, *Beta-Blockers Versus Digoxin to Control Ventricular Rate During Atrial Fibrillation*, 45 J. Am. Coll. Cardiology 1905, 1906 (June 2005), http://content.onlinejacc.org/article.aspx?articleid=1136643.
[54] Oppenheimer Equity Research, Lannett Company, Inc. (Feb. 7, 2014) at 2.

an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug. This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

134.    The generic Digoxin made by the defendant manufacturers are each chemical compounds composed of the same raw materials; indeed, Bedrosian has commented that Defendants use many of the same suppliers. He also acknowledged the commodity nature of Lannett's generics business during a November 7, 2013 earnings call.

135.    Because Defendants' Digoxin tablets are AB-rated generics of Lanoxin, pharmacists are permitted to substitute them for Lanoxin. Similarly, Defendants' Digoxin tablets are AB-rated generics of their branded counterparts, enabling pharmacists to substitute them for branded products.

136.    Moreover, because generic manufacturers generally spend little effort advertising or detailing their generic compounds (*i.e.*, the practice of providing promotional materials and free samples to physicians), the primary means for one generic manufacturer to differentiate its product from another generic competitor's is through price reductions.[55] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.  Inter-competitor contacts and communications

137.    As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (such as ████████ and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry

---

[55] *See* CBO, *Promotional Spending for Prescription Drugs (Dec. 2, 2009), available at* https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/reports/12-02-drugpromo_brief.pdf at 1.

meetings. As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[56]

138.    In addition, as noted above, Lannett's Bedrosian has made significant assertions about how Lannett and its competitors view the competitive landscape for generic drugs, and that none of them will compete on price for the foreseeable future. Such statements also indicate inter-competitor contacts and communications.

139.    The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events. For example, Defendants Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

140.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications.  These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[57] The sheer number of companies implicated in the investigations (including some of the Defendants here with specific respect to Digoxin) highlights  the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion:

---

[56] PaRR Report.

[57] State AG Amended Complaint ¶ 7.

(a)     **Actavis**: In February 2016, Actavis's predecessor, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[58]

(b)     **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to the DOJ's generic drug investigation.[59] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[60]

(c)     **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products." The Connecticut AG requested that Citron produce all documents produced to DOJ.[61]

(d)     **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[62]

(e)     **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ[63] and press reports indicate that Heritage has

---

[58] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at 27, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm

[59] Zeba Siddiqui, "India's Aurobindo shares hit nine-month low on US price-fixing lawsuit," Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV

[60] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf

[61] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm

[62] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17

[63] Tom Schoenberg , David McLaughlin & Sophia Pearson, "U.S. Generic Drug Probe Seen Expanding After Guilty Pleas," Bloomberg (Dec. 14, 2016), *available at*

applied to DOJ's leniency program seeking amnesty for a cartel violation.

(f) **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic Digoxin.[64]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[65] In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications.  In particular… Digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[66]

(g) **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of Digoxin.[67] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[68]   On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or

---

https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe

[64] Impax SEC Form 8-K (July 15, 2014), *available at*
https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm

[65] Impax SEC Form 8-K (Nov. 6, 2014), *available at*
https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm

[66] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at*
https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm

[67] Lannett press release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General

[68] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at*
https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm

pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[69]

(h)  **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena…seeking information relating to marketing, pricing and sales of select generic drugs" and that it had received a subpoena from the Connecticut AG seeking similar information.[70]   On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[71]

(i)  **Mylan**:  In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to…generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to…certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[72] On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[73]

---

[69] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, available at
http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm

[70] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at*
https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf

[71] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at*
http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf

[72] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at*
https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdo
c.htm

[73] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at*
https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdo
c.htm

(j)     **Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to Digoxin and doxycycline.[74] In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (Digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[75] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[76]

(k)     **Perrigo**:  On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[77]

(l)     **Sandoz**:  In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products…and related communications with competitors."[78]

(m)    **Taro**:  In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing,

---

[74] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm

[75] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm

[76] *Id.* at 31.

[77] Perrigo Press Release (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation

[78] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf

communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[79]

(n)     **Teva**: In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[80]

(o)     **Zydus**: Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[81]

## IX.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.     The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy

141.     Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Digoxin.

142.     No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Digoxin.

---

[79] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.html

[80] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.html

[81] *See* Rupali Mukherjeel, "US polls, pricing pressure may hit Indian pharma cos," The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms

143.    Plaintiffs are purchasers who indirectly purchased generic Digoxin manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

144.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

    (a)    Impax's Code of Conduct provides: "Impax is committed to free and open competition in the marketplace, and requires employees to strictly adhere to the antitrust laws in the countries where we do business…. No employee may discuss with, or provide information to, any competitor about pricing or related matters, whether the information concerns Impax or its suppliers, distributors, wholesalers or customers."[82]

    (b)    Lannett's Code of Business Conduct and Ethics "promotes compliance with laws."[83]

    (c)    Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."[84]

    (d)    Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."[85]

    (e)    Hikma's (the parent of West-Ward) Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means. Hikma will not collude with competitors on prices, bids or market allocations, nor

---

[82] Impax Code of Conduct, *available at*
http://s1.q4cdn.com/790711406/files/doc_downloads/Code-of-Conduct-2016.pdf

[83] Lannett Code of Business Conduct and Ethics, *available at*
http://www.lannett.com/docs/2013_Code_of_Business_Conduct_and_Ethics.pdf

[84] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf

[85] Par Code of Ethics, *available at* http://corpdocs.msci.com/ethics/eth_19100.pdf.

exchange information with third parties in a way that could improperly influence business outcomes."[86]

145.    It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

146.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

#### B.    Active concealment tolled the statutes of limitations

147.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Digoxin.

148.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Digoxin.

---

[86] Hikma Code of Conduct, *available at* http://www.hikma.com/en/sustainability/Code-of-conduct.html

149.     As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Digoxin. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic Digoxin they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Digoxin. Defendants' false statements and conduct concerning the prices of generic Digoxin were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic Digoxin at prices established by a free and fair market.

### 1.   Active concealment of the conspiracy

150.     Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.  Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

151.     Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Digoxin.

152.     As explained in the State AG complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through

52

the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[87]

153.    Defendants falsely denied that their price increases were caused by agreements with one another. For example, in earnings calls held in 2015 and 2016, Bedrosian of Lannett repeatedly denied that his company engaged in any wrongdoing. Moreover, Bedrosian defended his company's price hikes on generic drugs like Digoxin, calling them "[c]onsistent with industry norms."[88]

154.    In an August 2015 press release, Impax misleadingly characterized "significantly lower sales of generic Digoxin as a result of additional competition."[89] In fact, the conspiracy among Defendants reduced competition in the market for generic Digoxin, and prices remained at supracompetitive levels.

155.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic Digoxin to inflated, supracompetitive levels.

### 2.  Plaintiffs exercised reasonable diligence

156.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

---

[87] State AG Amended Complaint ¶ 13.

[88] http://www.forbes.com/sites/nathanvardi/2016/10/06/another-drug-company-that-raises-prices-like-crazy/2/#1c41cf0e77ef.

[89] http://investors.impaxlabs.com/Media-Center/Press-Releases/Press-Release-Details/2015/Impax-Reports-Second-Quarter-2015-Financial-Results/default.aspx.

157.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

158.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

159.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## X.    CONTINUING VIOLATIONS

160.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. As shown in the price charts above, Defendants continue to benefit from the effects of the conspiratorial price increases, as prices have not returned to the stable levels seen before the steep increases. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XI.    DEFENDANTS' ANTITRUST VIOLATIONS

161.    During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for generic Digoxin sold in the United States.

162.    In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the

purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of generic Digoxin sold in the United States. These activities included the following:

(a)     Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the pricing of generic Digoxin in the United States;

(b)     Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to allocate customers or rig bids for generic Digoxin sold in the United States;

(c)     Agreeing during those meetings, conversations, and communications to allocate customers for generic Digoxin sold in the United States;

(d)     Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for generic Digoxin sold in the United States;

(e)     Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

(f)     Selling generic Digoxin in the United States at collusive and noncompetitive prices; and

(g)     Accepting payment for generic Digoxin sold in the United States at collusive and noncompetitive prices.

163.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

164.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic Digoxin at inflated and supracompetitive prices.

165.     Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various IRP Damages Jurisdictions enumerated below.

166.     As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Digoxin than they would have paid in competitive markets.

167.     General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to independent pharmacists, who cannot negotiate their acquisition costs. Wholesalers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of generic Digoxin.

168.     The unlawful contract, combination and conspiracy has had the following effects, among others:

> (a)     price competition in the market for generic Digoxin has been artificially   restrained;

> (b)     prices for generic Digoxin sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

> (c)     purchasers of generic Digoxin sold by Defendants have been deprived of the benefit of free and open competition in the market for generic Digoxin.

## XII.   CLASS ACTION ALLEGATIONS

169.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All privately held pharmacies in the United States and its territories that indirectly purchased Defendants' generic Digoxin from October 1, 2013 through the present.
>
> This class excludes:  (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased Digoxin products directly from defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (d) all pharmacies owned or operated by publicly traded companies.

170.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "IRP Damages Jurisdictions")[90] on behalf of the following class (the "Damages Class"):

> All privately held pharmacies in the IRP Damages Jurisdictions that indirectly purchased Defendants' generic Digoxin products from October 1, 2013 through the present.[91]
>
> This class excludes:  (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased Digoxin products directly from defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members

---

[90] The IRP Damages Jurisdictions, for purposes of this complaint, are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands

[91] Plaintiffs may seek to certify state classes rather than a single Damages Class. See ¶ 178.

of their immediate families; (d) all pharmacies owned or operated by publicly traded companies.

171. The Nationwide Class and the Damages Class are referred to herein as the "Classes."

172. While Plaintiffs do not know the exact number of the members of the Classes, rosters of members of national independent pharmacy organizations indicate that there are at least 20,000 members in each class.

173. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Digoxin and/or engaged in market allocation for generic Digoxin sold in the United States;

(b) The identity of the participants of the alleged conspiracy;

(c) The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d) Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e) Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f) Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of generic Digoxin sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Digoxin, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

174.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Digoxin purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

175.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

176.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

177.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently

and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiffs reserve the discretion to certify the Damages Class as separate classes for each of the IRP Damages Jurisdictions or as separate classes for certain groups of IRP Damages Jurisdictions, should the Court's subsequent decisions in this case render that approach more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

178.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XIII.   CAUSES OF ACTION

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act
(on behalf of Plaintiffs and the Nationwide Class)**

179.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

180.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

181.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate

customers, rig bids and raise, maintain and fix prices for generic Digoxin, thereby creating anticompetitive effects.

182.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Digoxin.

183.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated independent pharmacies in the Nationwide Class who purchased generic Digoxin have been harmed by being forced to pay inflated, supracompetitive prices for generic Digoxin.

184.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

185.    Defendants' conspiracy had the following effects, among others:

    (a)    Price competition in the market for generic Digoxin has been restrained, suppressed, and/or eliminated in the United States;

    (b)    Prices for generic Digoxin provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

    (c)    Plaintiffs and members of the Nationwide Class who purchased generic Digoxin indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

186.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Digoxin purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

187.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

188.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation of State Antitrust Statutes[92]
### (on behalf of Plaintiffs and the Damages Class)

189.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

190.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Digoxin in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

191.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Digoxin and to allocate customers for generic Digoxin in the United States.

192.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

> (a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Digoxin at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and

---

[92] Statutory antitrust violations are alleged herein for the following jurisdictions: Alabama, Arizona, California, District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

members of the Damages Class with respect to generic Digoxin provided in the United States; and

(b)     participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

193.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Digoxin. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

194.    In addition, defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiffs and the members of the Damages Class.

195.    Accordingly, plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

196.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

197.    **Alabama:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Digoxin was restrained, suppressed, and eliminated throughout Alabama; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. By reason of the foregoing, Defendants

entered into an agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60, et seq.

198.    **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, et seq. Defendants' combination and conspiracy had the following effects: (1) price competition for generic Digoxin was restrained, suppressed, and eliminated throughout Arizona; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, et seq.

199.    **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 et seq. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Digoxin at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were

to fix, raise, maintain, and stabilize the prices of generic Digoxin. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Digoxin. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition for generic Digoxin has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Digoxin provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Digoxin indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Digoxin than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

200.   **District of Columbia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, et seq. Defendants' combination and conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including

those who resided in the District of Columbia and/or purchased generic Digoxin in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Digoxin in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Digoxin, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, et seq.

201.    **Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

202.    **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, et seq.

203.    **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, et seq. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Digoxin, increasing the prices of generic Digoxin, preventing competition in the sale of generic Digoxin, or binding themselves not to sell generic Digoxin, in a manner that established the price of generic Digoxin and precluded free and unrestricted competition among themselves in the sale of generic Digoxin, in violation of Kan. Stat. Ann. § 50-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, et seq.

204.     **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, et seq.

205.     **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, et seq.

206.     **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained,

suppressed, and eliminated throughout Minnesota; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, et seq.

207. **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, et seq. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, et seq.

208.     **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, et seq.

209.     **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, et seq.

210.   **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, et seq.

211.   **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, et seq.

212.    **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Law § 340, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New York General Business Law § 340, et seq. The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, et seq.

213.    **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade

in violation of North Carolina Gen. Stat. § 75-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, et. seq.

214.    **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, et seq.

215.    **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised

Statutes § 646.705, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, et seq.

216.  **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, et seq.

217.  **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade

in violation of South Dakota Codified Laws Ann. § 37-1-3.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, et seq.

218.   **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, et seq.

219.   **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code

Annotated § 76-10-3101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, et seq.

220. **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, et seq.

221. **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have

entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, et seq.

222.   **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, et seq. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin.   During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, et seq.

223.   **As to All Jurisdictions Above:** Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Digoxin than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the

above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

224.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

225.     Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT

### Violation of State Consumer Protection Statutes[93]
### (on behalf of Plaintiffs and the Damages Class)

226.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

227.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

228.     **Alaska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing,

---

[93] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, Georgia, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Carolina, South Dakota, West Virginia, Wisconsin and the U.S. Virgin Islands.

controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Digoxin were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

229.   **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Digoxin were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and

proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages

Class have been injured in their business and property and are threatened with further injury.

Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation

of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the

Damages Class seek all relief available under that statute.

230.   **California:**  Defendants  have  engaged  in  unfair  competition  or  unfair,

unconscionable, deceptive or fraudulent acts or practices in violation of California Business and

Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed,

sold, or distributed generic Digoxin in California, and committed and continue to commit acts of

unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code,

by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203

and 17204 of the California Business and Professions Code, to obtain restitution from these

Defendants for acts, as alleged herein, that violated § 17200 of the California Business and

Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as

alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-

disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing

course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business

acts or practices within the meaning of California Business and Professions Code §17200, *et seq*.,

including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as

set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions

Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-

disclosures, as described above, whether or not in violation of § 16720, *et seq*. of the California

Business and Professions Code, and whether or not concerted or independent acts, are otherwise

unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Digoxin in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Digoxin. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

231.   **Colorado:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq*. Defendants engaged in an unfair and deceptive trade

practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

232.   **Delaware:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and

proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

233.   **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

234.   **Georgia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed,

or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia Code § 10-1-370, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

235. **Michigan:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed,

or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

236.   **Minnesota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.* Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer

injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

237. **Nebraska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed generic Digoxin in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

238. **Nevada:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in Nevada.

Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

239.   **New Hampshire:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Digoxin prices were raised, fixed, maintained, and

stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants marketed, sold, or distributed generic Digoxin in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

240.    **New Jersey:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by

Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

241.   **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Digoxin were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Digoxin as set forth in N.M.S.A., § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Digoxin because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the

overcharges. Defendants' conduct with regard to sales of generic Digoxin, including their illegal conspiracy to secretly fix the price of generic Digoxin at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Digoxin. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

242. **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Digoxin that either omitted

material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Digoxin; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Digoxin were misled to believe that they were paying a fair price for generic Digoxin or the price increases for generic Digoxin were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Digoxin would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Digoxin would have a broad impact, causing consumer class members who indirectly purchased generic Digoxin to be injured by paying more for generic Digoxin than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants marketed, sold, or distributed generic Digoxin in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and

controlled, manufactured, sold and/or distributed generic Digoxin in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

243.   **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Digoxin created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout North Carolina;

(2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants marketed, sold, or distributed generic Digoxin in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Digoxin in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

244.    **North Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

245. **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

246. **South Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information

important to Plaintiffs and members of the Damages Class as they related to the cost of generic Digoxin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

247.    **West Virginia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably

under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Digoxin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

248.   **Wisconsin:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe

that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Digoxin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

249.   **U.S. Virgin Islands:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused

by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Digoxin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

## **FOURTH COUNT**

### **Unjust Enrichment[94]**
### **(on behalf of Plaintiffs and the Damages Class)**

250.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

251.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the IRP Damages Jurisdictions.

252.    Defendants have unlawfully benefited from their sales of generic Digoxin because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged

---

[94] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

privately held pharmacies, who purchased generic Digoxin at prices that were more than they would have been but for Defendants' unlawful actions.

253.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

254.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

255.    Defendants have been enriched by revenue resulting from unlawful overcharges for generic Digoxin while Plaintiffs have been impoverished by the overcharges they paid for generic Digoxin imposed through Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' impoverishment are connected.

256.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

257.    Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

258.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Digoxin.

259.   The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Digoxin are ascertainable by review of sales records.

260.    It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of generic Digoxin.

261.   It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased generic Digoxin, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

262.   The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Digoxin is a direct and proximate result of Defendants' unlawful practices.

263.   The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

264.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Digoxin derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

265.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as generic Digoxin prices remain inflated above pre-conspiracy levels.

266.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of generic Digoxin.

267.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of generic Digoxin by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

## XIV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment for the following relief:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a per se violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

C.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of

the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

D.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

E.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

F.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

H.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## XV.   <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


Dated: August 15, 2017                                    Respectfully submitted,

                                                         /s/  *Jonathan W. Cuneo*


Peter Gil-Montllor                                Jonathan W. Cuneo
Matthew Prewitt                                   Joel Davidow
**CUNEO, GILBERT & LADUCA LLP**                   Daniel Cohen
16 Court Street, Suite 1012                       Victoria Romanenko
Brooklyn, NY 11241                                Blaine Finley
202-789-3960                                      **CUNEO, GILBERT & LADUCA LLP**
pgil-montllor@cuneolaw.com                        4725 Wisconsin Ave., NW Suite 200
                                                  Washington, DC 20016
                                                  202-789-3960
                                                  jonc@cuneolaw.com

                                                  *Lead Counsel for the Indirect Reseller Plaintiffs*